

SO ORDERED.

SIGNED this 24 day of May, 2007.

_____
**A. Thomas Small**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| **NATIONAL GAS DISTRIBUTORS, LLC** | **06-00166-8-ATS** |
| DEBTOR | |

| | |
|---|---|
| **RICHARD M. HUTSON, II, Trustee for National Gas Distributors, LLC, f/k/a Paul Lawing Jr., LLC** | **ADVERSARY PROCEEDING NO.** |
| Plaintiff | **S-06-00267-8-AP** |
| v. | |
| **SMITHFIELD PACKING COMPANY, INCORPORATED** | |
| Defendant. | |

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS
### AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

The matters before the court are several motions of the defendant, Smithfield Packing Company,

Inc. ("Smithfield"). Smithfield moves to dismiss, under Rule 12(b)(6) of the Federal Rules of Civil

Procedure (made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of

Bankruptcy Procedure), the claims of the plaintiff, Richard M. Hutson, II, trustee for the chapter 11 debtor, National Gas Distributors, LLC.  Smithfield  moves in the alternative for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure).  Smithfield also moves to strike the Affidavit of Claire P. Gotham.  With the consent of the parties, a hearing was held in Durham, North Carolina at the Duke University School of Law on April 4, 2007.

Smithfield's motion to dismiss the trustee's claims under §§ 548(a)(1)(A) and 548(a)(1)(B) is based on an affirmative defense and is more appropriately a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure).  However, whether the court is proceeding under a motion to dismiss under Rule 12(b)(6), a motion for judgment on the pleadings under Rule 12(c), or a motion for summary judgment under Rule 56, the parties agree that  if the contract between Smithfield and National Gas is determined to be a "swap agreement" as that term is defined under § 101(53B) of the Bankruptcy Code (as amended in 2005),[1] and if Smithfield and National Gas are "swap participants" as defined by § 101(53C), then Smithfield, pursuant to §§ 546(g), 548(c) and 548(d)(2), has an absolute defense to the trustee's causes of action.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United

---

[1] See the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23, § 907 (April 20, 2005).

States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(H), which this court may hear and determine.

## BACKGROUND

National Gas Distributors, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 20, 2006. Lawrence R. Hirsch, the receiver for National Gas in a state court proceeding pending at the time of the debtor's bankruptcy petition, requested the appointment of a trustee. Without objection by the debtor, the court appointed Richard M. Hutson, II as chapter 11 trustee. The trustee filed complaints against more than 20 former customers of National Gas, including Smithfield. The complaints seek to avoid, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (a)(1)(B), transfers made by the debtor, and to recover those transfers from the defendants pursuant to § 550(a)(1). Two of the other defendants, Stadler's Country Hams, Inc. and E.I. Du Pont De Nemours and Company, filed motions similar to those filed by Smithfield in this adversary proceeding, and all of the motions were heard together. The orders entered in the other proceedings will adopt the legal analysis contained in this order.

The gist of the trustee's complaints is that National Gas, as part of a fraudulent scheme, sold natural gas to some of its customers, including Smithfield, at below market prices. Specifically, with respect to Smithfield, the trustee alleges that during the twelve months preceding the filing of the bankruptcy petition, the debtor sold natural gas to Smithfield at below market prices resulting in an aggregate loss to National Gas of approximately $2,144,750. The below market price of each sale, the alleged market price at the time of each sale, and the resulting loss to National Gas from each sale is set forth in detail in an attachment to the complaint.

The trustee alleges that the sales were made by National Gas with the intent to hinder, delay and defraud creditors. He alleges that the fraud included below-market sales, false invoices, false reporting of invoices to the debtor's secured lenders, and obtaining loans on the basis of false information. According to the trustee, those alleged facts show actual fraud and support avoidance of the transfers pursuant to § 548(a)(1)(A).

The trustee also alleges that at the time of the transfers, National Gas was insolvent and, because the sales were made at a price below market value, National Gas did not receive reasonably equivalent value for the natural gas that it sold. Accordingly, the trustee maintains that the transfers were constructively fraudulent and should be avoided under § 548(a)(1)(B).

Smithfield filed an answer containing, among other things, a First Affirmative Defense stating that the transfers are not avoidable "because such transfers were made by or to a swap participant under or in connection with swap agreements before the commencement of the case, and the transfers are therefore excepted from avoidance pursuant to section 546(g) of the Bankruptcy Code." Answer at 6. Smithfield then filed the motion to dismiss now before the court, contending as follows:

> 1. The Trustee cannot avoid the Transfers (as defined in the Complaint) as constructive fraudulent transfers under section 548(a)(1)(B) of the United States Bankruptcy Code, 11 U.S.C. § 101 et. seq. (the "Code"), because each Transfer was made by or to a swap participant under or in connection with a swap agreement and is thus not avoidable as a constructive fraudulent transfer, pursuant to section 546(g) of the Code.

> 2. Further, the Trustee cannot avoid the Transfers as actual fraudulent transfers under section 548(a)(1)(A) of the Code because section 548(c) renders each Transfer not avoidable as an actual fraudulent transfer because: (a) each Transfer was made in connection with a swap agreement to a swap participant deemed conclusively under section 548(d)(2)(D) to have taken such Transfer for value to the extent of such Transfer; and (b) as conceded by the Trustee in the Complaint, Defendant received each such Transfer in good faith.

Smithfield Motion to Dismiss at 2. Smithfield seeks dismissal pursuant to Rule 12(b)(6), or, in the alternative, summary judgment pursuant to Rule 56.

An *amicus curiae* brief was filed by the International Swaps and Derivatives Association, Inc. in support of Smithfield's motion.

## The Contract

The contract consists of a "Base Contract for Sale and Purchase of Natural Gas," generated on the North American Energy Standards Board, Inc.'s Standard Form 6.3.1, and a series of e-mails between Smithfield and the debtor. The Base Contract allows the parties to select options within a set of general terms and conditions. Specifically, the contract includes the following terms:

| General Terms Provision | Option Selected |
| --- | --- |
| Section 1.2 Transaction Procedure | Oral |
| Section 2.5 Confirm Deadline | 2 Business Days after receipt |
| Section 3.2 Performance Obligation | Cover Standard |
| Section 2.26 Spot Price Publication | Gas Daily Midpoint |
| Section 6 Taxes | Buyer Pays At and After Delivery Point |
| Section 7.2 Payment Date | 25th Day of Month following Month of delivery |
| Section 7.2 Method of Payment | Wire transfer |
| Section 7.7 Netting | Netting applies |
| Section 10.3.1 Early Termination Damages | Early Termination Damages Apply |
| Section 10.3.2 Other Agreement Setoffs | Other Agreement Setoffs Apply |
| Section 14.10 Confidentiality | Confidentiality applies |

Base Contract at 1.

5

The "Oral Transaction Procedure" provides that gas purchase and sale transactions may be effectuated in an electronic data interchange ("EDI") transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties. Base Contract at 2, § 1.2.

The "Performance Obligation" provides that "Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract. Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction." Base Contract at 4, § 3.1. The "Cover Standard" provides for damages for a breach of the agreement:

> The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the preforming party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s). Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

Base Contract at 4, § 3.2.

Section 10.5 of the Base Contract provides, "The parties agree that the transactions hereunder constitute a 'forward contract' within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each 'forward contract merchants' within the meaning of the United States Bankruptcy Code."[2]  Base Contract at 8, § 10.5.

After entry of the Base Contract, the parties set their prices for future months via telephone and e-mail correspondence.  For example, on February 25, 2005, Mr. Lawing sent an e-mail to Robert Miller at Smithfield as follows: "Per our telephone conversation, I have $5.75 gas plus basis for the summer (Apr-Oct) and I am still trying to nail down our Nov-Mar piece."  Authentication Decl. of Robert E. Miller, Ex. B-3.  On August 12, 2005, Mr. Lawing sent an e-mail to Mr. Miller at Smithfield with a subject line of "Winter," "confirming a $6.60 cap for all volumes for all the NC plants" through March 2006. Authentication Decl. of Robert E. Miller, Ex. B-4.

The issue before the court is whether the contract between Smithfield and National Gas is a "swap agreement" involving "swap participants."  If so, the trustee cannot prevail on his causes of action.

## STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT

When deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in the plaintiff's favor.  Ibarra v. United States, 120

---

[2]   The Base Contract is a standard form created in April 2002, prior to the 2005 amendments to the Bankruptcy Code, and this provision is apparently an attempt to bring the parties within the protections of § 546(e) as they existed in 2002.  See footnote 7, *infra*.

F.3d 472, 474 (4th Cir. 1997). Because the rules require only notice pleading, courts construe a plaintiff's allegations liberally. In addition, the court may not consider materials outside the pleadings without converting the motion to one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. See Rule 7012, Fed. R. Bankr. P. The standard is the same for motions for judgment on the pleadings under Rule 12(c). Burbach Broadcasting Co. of Delaware v. Elkins Radio, 278 F.3d 401, 405-06 (4th Cir. 2002); Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam). Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327, 106 S. Ct. at 2555. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Summary judgment should not be granted "unless the moving party has established his right to a judgment with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982) (internal quotations omitted).

## DISCUSSION

The trustee is proceeding against Smithfield under both § 548(a)(1)(A) and § 548(a)(1)(B), and in several related adversary proceedings, the court has already considered motions to dismiss under Rule 12(b)(6) and has determined that the trustee adequately pled his causes of action under those sections of the Bankruptcy Code.  See Hutson v. Purolator Prods. NA, LLC (In re National Gas Distribs., LLC), Adv. Pro. No. S-06-00122-8-AP (Bankr. E.D.N.C. Dec. 6, 2006).

Section 548 provides, in relevant part, that

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
    (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
    (B)(i) received less than a reasonably equivalent value in exchange for such  transfer or obligation; and
    (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
    (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
    (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
    (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1) (2005).

The question before the court is whether Smithfield falls within an exception to § 548(a) that is fatal to the trustee's causes of action.  Smithfield contends that it is protected by the "safe harbor" provided by

§ 546(g) with respect to the trustee's § 548(a)(1)(B) constructive fraud claim, and that it gave reasonably equivalent value as provided in § 548(c) and § 548(d)(2)(D) with respect to the trustee's actual fraud claim under § 548(a)(1)(A).

Section 546(g) provides

(g) Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer made by or to a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g) (2005). The safe harbor from the constructive fraud allegation is available to Smithfield if it can show that it is a "swap participant" within the meaning of the statute, and that the transactions at issue constitute transfers under a "swap agreement."

Similarly, Smithfield is protected from the actual fraud allegation by the safe harbor provided by § 548(c) and § 548(d)(2)(D), if Smithfield shows that it is a "swap participant" and that its contract with the debtor is a "swap agreement." These subsections of § 548 provide:

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(d)(1) For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

(2) In this section–

* * *

10

(D) a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer[.]

11 U.S.C. § 548(c); § 548(d)(2)(D) (2005).

Section 548(c) protects a transferee from avoidance actions under § 548(a)(1)(A) if the transferee takes for value in good faith, to the extent of value given. Section 548(d)(2)(D) provides that a swap participant that receives a transfer in connection with a swap agreement takes for value to the extent of the transfer. Consequently, because the trustee does not contest that Smithfield received the transfer in good faith, the trustee may not avoid the transfer if the contract is a "swap agreement" and Smithfield is a "swap participant."

The definitions of "swap agreement" and "swap participant," appear in §§ 101(53B) and 101(53C) of the Bankruptcy Code, as follows:

(53B) The term "swap agreement"--
(A) means--
(i) any agreement, including the terms and conditions incorporated by reference in such agreement, which is--
(I) an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap;
(II) a spot, same day-tomorrow, tomorrow-next, forward, or other foreign exchange, or precious metals agreement;
(III) a currency swap, option, future, or forward agreement;
(IV) an equity index or equity swap, option, future, or forward agreement;
(V) a debt index or debt swap, option, future, or forward agreement;
(VI) a total return, credit spread or credit swap, option, future, or forward agreement; or
(VII) a commodity index or a commodity swap, option, future, or forward agreement;
(VIII) a weather swap, option, future, or forward agreement;
(ii) any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph and that--

11

(I) is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives markets (including terms and conditions incorporated by reference therein); and

(II) is a forward, swap, future, or option on one or more rates, currencies, commodities, equity securities, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or measures of economic or financial risk or value;

(iii) any combination of agreements or transactions referred to in this subparagraph;

(iv) any option to enter into an agreement or transaction referred to in this subparagraph;

(v) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), or (iv), together with all supplements to any such master agreement, and without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement under this paragraph, except that the master agreement shall be considered to be a swap agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i), (ii), (iii), or (iv); or

(vi) any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in clause (i) through (v), including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and

(B) is applicable for purposes of this title only, and shall not be construed or applied so as to challenge or affect the characterization, definition, or treatment of any swap agreement under any other statute, regulation, or rule, including the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Securities Investor Protection Act of 1970, the Commodity Exchange Act, the Gramm-Leach-Bliley Act, and the Legal Certainty for Bank Products Act of 2000.

(53C) The term "swap participant" means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor.

11 U.S.C. § 101(53B); § 101(53C) (2005).

The court's analysis of the meaning of "swap agreement" begins, as it must with every statute, with "the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S. Ct.

1026, 1030 (1989); see also Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S. Ct. 941, 950 (2002) (court's first step is to determine whether language has "plain and unambiguous meaning with regard to the particular dispute in the case"); Toibb v. Radloff, 501 U.S. 157, 162, 111 S. Ct. 2197 (1991) (courts examine language first); In re Sunterra Corp., 361 F.3d 257, 265 (4th Cir. 2004). The definition of "swap agreement" first appeared in the Bankruptcy Code in 1990 and was substantially expanded by BAPCPA. Unfortunately, as is true with many BAPCPA amendments, the resulting statute is confusing and its meaning anything but clear.

Smithfield maintains that the analysis is quite simple – Smithfield's contract to purchase natural gas from National Gas is a swap agreement because, pursuant to § 101(53B)(A)(i)(VII), a swap agreement includes a commodity "forward agreement." According to Smithfield, its contract with National Gas is a forward contract as defined in § 101(25), natural gas is a commodity, and a commodity "forward agreement" necessarily includes a forward contract dealing with natural gas. The analysis, however, is not at all easy. "Swap agreement," "forward agreement" and "forward contract" are not part of this court's or most people's "plain meaning" vocabulary, and the court must look to other sources, including the context in which the terms appear in the Code.

Both parties have cited cases that they contend support their interpretations of the statute, but those cases, which were decided before the BAPCPA amendments, involve different sections of the Bankruptcy Code, different federal statutes, or facts that are significantly different from those before the court. Both parties also rely on aspects of the legislative history for support, but the legislative history also is contradictory.

13

The trustee concedes that the contract is a forward *contract* involving a commodity, but argues that the contract is not a forward *agreement* as that undefined term is used in § 101(53B)(A)(i)(VII). The argument that the contract is a forward contract is supported by a decision of the United States Court of Appeals for the Fifth Circuit in Williams v. Morgan Stanley Capital Group, Inc. (In re Olympic Natural Gas Co.), 294 F.3d 737 (5th Cir. 2002). Notwithstanding the trustee's concession and Olympic Natural Gas, the court is not convinced that the contract between National Gas and Smithfield is a forward contract as defined in § 101(25).

"Forward contract" is defined in § 101(25) as follows:

(25) The term "forward contract" means--
    (A) a contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement;
    (B) any combination of agreements or transactions referred to in subparagraphs (A) and (C);
    (C) any option to enter into an agreement or transaction referred to in subparagraph (A) or (B);
    (D) a master agreement that provides for an agreement or transaction referred to in subparagraph (A), (B), or (C), together with all supplements to any such master agreement, without regard to whether such master agreement provides for an agreement or transaction that is not a forward contract under this paragraph, except that such master agreement shall be considered to be a forward contract under this paragraph only with respect to each agreement or transaction under such master agreement that is referred to in subparagraph (A), (B), or (C); or
    (E) any security agreement or arrangement, or other credit enhancement related to any agreement or transaction referred to in subparagraph (A), (B), (C), or (D), including any guarantee or reimbursement obligation by or to a forward contract merchant or financial participant in connection with any agreement or transaction referred to in any

14

such subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

11 U.S.C. § 101(25) (2005).

The definition provides that a forward contract is one which is "presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101(25). The contract at issue before the court is a simple supply contract involving the sale of natural gas by one party, National Gas, to another party, Smithfield, and is not a contract that is the subject of "dealing in the forward contract trade."[3] To complicate things further, the definition of forward contract excludes a "commodity contract." § 101(25). All parties agree that natural gas is a commodity. The term commodity contract is not defined and could reasonably be interpreted to mean a contract involving a commodity to be delivered in the future, but one that is not "the subject of dealing in the forward contract trade." For both of these reasons, the court believes that a simply supply contract should not be included within the definition of a forward contract.

---

[3]The definition of "forward contract" contains a clause beginning with the word "which," and that word could affect the interpretation of the definition, depending on the word the clause modifies. The definition reads: "a contract . . . for the purchase, sale, or transfer of a commodity . . . or any similar good, article, service, right, or interest *which is presently or in the future becomes the subject of dealing in the forward contract trade . . . .*" If this phrase modifies "contract," then the definition is limited to the agreements that are themselves the subject of dealing in the forward contract trade. If the phrase modifies "similar good, article, service or interest," then it is only the commodity, good, article, service or interest underlying the contract that must be the subject of dealing in the forward contract trade.

The language used in the definition of "forward contract merchant" in § 101(26) supports a conclusion that the "which" does not refer to the contract, but rather to the good, article, service or interest. That section also uses the phrase "commodity . . . or any similar good, article, service, right, or interest *which is presently or in the future becomes the subject of dealing in the forward contract trade . . . .*" but does not have a competing noun that the phrase might modify. Although the "which" likely does not refer to the contract, the language of the statute is ambiguous. See In re Mirant Corp., 310 B.R. 548, 565-66 (Bankr. N.D. Tex. 2004).

15

The decision in Olympic Natural Gas found that a straightforward supply contract calling for delivery in the future was a forward contract, but the contract under consideration in that case was not the type of simple supply contract that is presently before this court. The contract in Olympic Natural Gas was a "Natural Gas Sales and Purchase Contract" which provided that "each month the parties would enter into a series of individual transactions, in which each would act sometimes as buyer and sometimes as seller, after agreeing on the price, quantity, timing, and delivery point for the natural gas." Olympic Natural Gas, 294 F.3d at 739. One of the parties to the contract, Morgan Stanley Capital Group, was not a supplier of natural gas, but it acted as both buyer and seller under the contract. The contract in that case clearly was not an actual supply contract. Another factor distinguishing that case from this one is that the issue before the court in Olympic Natural Gas involved protection, under § 546(e), of settlement payments between forward contract merchants, not the broad protections afforded to swap participants engaged in swap agreements.[4]

A sticking point for both the Olympic Natural Gas court, and this court as well, is the confusing exclusion of "commodity contract" from the definition of forward contract.    The court in Olympic Natural Gas relied on commentary in Collier on Bankruptcy to deal with the confusion. Citing Collier, that court construed "commodity contract" to mean "purchases and sales of commodities for future delivery on, or subject to the rules of, a contract market or board of trade, and leverage transactions." Olympic Natural

_____

[4]A "forward contract merchant" is defined in § 101(26) as meaning "a Federal Reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." Section 546(e) protects settlement payments between forward contract merchants from avoidance under §§ 544, 545, 547, 548(a)(1)(B) and 548(b).

_Gas_, 294 F.3d at 741 (citing 5 <u>Collier on Bankruptcy</u> ¶ 556.02[2], at 556-4 (Lawrence P. King ed., 15th ed. 2002).  This is in contrast with "forward contracts" that are "contracts for the future purchase or sale of commodities that are not subject to the rules of a contract market or board of trade." <u>Olympic Natural Gas</u>, 294 F.3d at 741 (citing 5 <u>Collier</u> ¶ 556.02[2], at 556-5).  The court stated that it would not adopt an interpretation of commodities contract that conflicted with the definition in § 761(4).  The court suggested that "[b]y exempting 'commodities contracts' from the definition of 'forward contract' in § 101(25) the Code retains a distinct definition of 'commodities contracts.'" <u>Olympic Natural Gas</u>, 294 F.3d at 741 (citing 11 U.S.C. § 761(4) (defining "commodity contract")).

An equally plausible and more basic argument can be made that "commodity contract," as used in § 101(25), should be given its "plain meaning," which is a simple commodity supply contract.  Section 103(d) of the Bankruptcy Code provides that subchapter IV of chapter 7, which includes § 761(4), applies only in a case under chapter 7 involving a commodity broker.  If Congress had intended for "commodity contract" to have the meaning provided by § 761(4), it would have said so, as it did in that same sentence with respect to "commodity."  Section 101(25) expressly states that "commodity" is defined in § 761(8).[5]

The court in <u>Olympic Natural Gas</u> also found support for its interpretation of "forward contract" in that term's "traditional definition," as expressed by several circuit court opinions.  <u>See</u> <u>Nagel v. ADM</u>

---

[5] The bankruptcy court in <u>In re Mirant Corp.</u>, 310 B.R. 548-566 (Bankr. N.D. Tex. 2004), felt that no inference should be drawn from the omission of § 761(4) in § 101(25), because the reference to § 761(8) was added by Congress in 1990 to clarify the meaning of "commodity."  That may be so, but the fact remains that Congress did not refer to § 761(4) either in 1990 or in 2005 when the definition of "forward contract" was amended by BAPCPA.  Section 101(25)(A) *was* amended by the Financial Netting Improvements Act of 2006, Pub. L. 109-390, § 5(a)(1)(C)(i), and now provides that "commodity contract" *is* defined in § 761.  The 2006 amendment is not applicable in this case, because the case was filed prior to the amendment's effective date of December 12, 2006.

Investor Servs., Inc., 217 F.3d 436 (7th Cir. 2000); Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc., 680 F.2d 573 (9th Cir. 1982); Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983 (8th Cir. 1999) (cited in Olympic Natural Gas, 294 F.3d at 741).  All of those cases, however, involve the Commodity Exchange Act, not the Bankruptcy Code, and the context in which the issues were raised and the consequences that flowed from the definition of "forward contract" are quite different from the issues that are raised and resulting consequences in a bankruptcy setting.[6]  Congress sometimes does include, in the Bankruptcy Code, "specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes." Howard Delivery Serv., Inc. v. Zurich American Ins. Co., – U.S. –, 126 S. Ct. 2105, 2113 (2006) (quoting United States v. Reorganized CF&I Fabricators of Utah, Inc.), 518 U.S. 213, 219, 116 S. Ct. 2106 (1996)).  When those directions are not given, the court has "no warrant to write them into the text." Howard Delivery, 126 S. Ct. at 2113.

    The gist of all this is that significant questions remain as to whether the contract at issue is a forward contract.  The issue is not dispositive and the court therefore will assume, as did the trustee, that the contract is a forward contract within the meaning of § 101(25).   A forward contract is not identical to a forward agreement, however, and if the contract is not a forward agreement, it is not a swap agreement.

    As previously mentioned, Smithfield offers a straightforward, linear argument: § 101(53B)(A)(i)(VII) provides that a swap agreement includes "a commodity index or a commodity swap, option, future or forward agreement;" the contract with National Gas is a forward contract as defined in

_____

[6]The definitions of "forward contract" in the Federal Deposit Insurance Act and the Federal Credit Union Act were amended by BAPCPA to coincide with the new definition of "forward contract" in the Bankruptcy Code.  Pub. L. 109-8, 119 Stat. 23 § 901(d) (2005).

§ 101(25);  natural gas is a commodity; and a "commodity forward agreement" necessarily includes a forward contract dealing with natural gas.  Because the plain statutory definition of "swap agreement" includes the contract at issue, Smithfield argues, the court may not look to outside sources to determine whether the contract would be a "swap agreement" in any other context, including definitional sources within the financial industry itself.  In the event the court does look outside the statutory language, Smithfield points to the legislative history of the 2005 amendments discussing the definition of "swap agreement."  In it, the following commentary appears: "The use of the term 'forward' in the definition of 'swap agreement' is not intended to refer only to transactions that fall within the definition of 'forward contract.'  Instead, a 'forward' transaction could be a 'swap agreement' even if not a 'forward contract.'" H.R. Rep. No. 109-31, pt.1, at 129.

Smithfield also refers to the fact that Black's Law Dictionary defines "forward contract" to include a "forward agreement":

> *forward contract*.  An agreement to buy or sell a particular nonstandardized asset (usu. currencies) at a fixed price on a future date.  Unlike a futures contract, a forward contract is not traded on a formal exchange.  Also termed *forward agreement*.

Black's Law Dictionary 345 (8th ed. 2004).  Smithfield contends that "agreement" is broader than "contract," and that "contracts" are necessarily a subset of  "agreements."  Smithfield also suggested that because the International Swaps and Derivatives Association (the representative association for the financial industry) filed an *amicus* brief supporting the argument that the contract is a swap agreement, the industry as a whole would recognize this contract as a swap agreement.   All taken together, Smithfield asserts, this is a forward contract that also is a forward agreement, and thus for that reason is a swap agreement.

19

The trustee disagrees. He urges the court to essentially step back and see the forest rather than only the trees. The special protections afforded to swap agreements were intended to apply to complicated financial transactions, he argues, and not to straightforward supply agreements involving the sale of natural gas. The trustee cautions that if Smithfield's argument prevails, each sale of a commodity with a delivery date more than two days after the contract date would be a swap agreement, including the simple sale of, for example, hogs or corn. The definition of "swap agreement" cannot be expanded to apply to every commodity contract that has a future delivery date. The trustee acknowledges that there are legitimate reasons for Congress to protect recognized *financial* markets given their far-ranging impact, but he contends that the protection should not extend to the simple sale of goods at the "farmer's market." In a nutshell, the bedrock of the trustee's legal argument is that it would defy both Congressional intent and basic common sense to define a swap agreement in such a way as to include a family farmer's agreement with a consumer to sell a bushel of corn at the end of the month for a fixed price.

As the foregoing discussion illustrates, the court cannot rely on the plain language of the statute. The term "forward agreement" is not in everyday usage, its meaning is uncertain, and the court must consider other rules of statutory interpretation. A review of the relevant statute's history is in order. See Toibb, 501 U.S. at 162, 111 S. Ct. at 2200 (explaining that where the "resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear") (internal quotations omitted).

Prior to the amendments at issue, swap agreements were defined more narrowly in the Bankruptcy Code. The definition of swap agreement first became part of the Bankruptcy Code in 1990, Pub. L. No. 101-311 (June 25, 1990). Congress sought to address "concerns regarding volatility in the swap

20

agreement markets resulting from the uncertainty over their treatment in the Bankruptcy Code." H.R. Rep. No. 484, 101st Cong., 2d Sess. 3 (1990). The House Report for the 1990 amendments suggests that Congress intended to protect the financial markets. "U.S. Bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility. Because financial markets can change significantly in a matter of days, or even hours, a non-bankrupt party to *ongoing securities and other financial transactions* could face heavy losses unless the transactions are resolved promptly and with finality." H.R. Rep. No. 484, 101st Cong., 2d Sess. 3 (1990) (emphasis added). The remarks offered in both the House and Senate are in accord. <u>See</u> 136 Cong. R. H 2282 (May 15, 1990) (statement of Rep. Brooks); 136 Cong. R. S S7335 (daily ed. June 6, 1990) (statement of Sen. DeConcini).

The definition of swap agreement in 1990 "set out a non-exhaustive list of swap-like transactions – rate, basis, commodity, currency, and cross-currency rate swaps; interest rate and currency options; rate caps, floor, and collars; and 'any other similar agreement.'" Edward R. Morrison & Joerg Regal, <u>Financial Contracts and the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges</u>, 13 Am Bankr. Inst. L. Rev. 641, 646 (2005).

The definition of swap agreement was amended in 1994 to "confirm[] the market understanding that spot foreign exchange contracts are included within the definition of 'swap agreement.'" H.R. Rep. No. 103-834, 103rd Cong., 2nd Sess. 29 (Oct. 4, 1994); 140 Cong. Rec. H10768 (Oct. 4, 1994). As amended in 1994, § 101(53B) read as follows:

> The term "swap agreement" means
> (A) an agreement (including terms and conditions incorporated by reference therein) which
> is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest

rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency operation, any other similar agreement (including option to enter into any of the foregoing;
(B) any combination of the foregoing; or
(C) a master agreement for any of the foregoing together with all supplements[.]

11 U.S.C. §101(53B) (1994).

Clearly, the contract before the court today is not the type of contract identified in the pre-BAPCPA definition of swap agreement and is not similar to any transaction typical in the swap markets. Consequently, prior to the 2005 amendments, the transfers under the contract at issue would have been protected only by § 546(e) and § 548(d)(2)(B), to the extent that those transfers were "settlement payments" made by or to a "forward contract merchant."[7]  The pre-BAPCPA definition of "swap agreement" could not have been stretched to include the transactions at issue.

The definition applicable to the issue before the court is, of course, the post-BAPCPA definition, which is more expansive.  Why did Congress expand the definition of swap agreement?  Legislative history is available and, in contrast to most of BAPCPA's legislative history which merely repeats the statute, the legislative history attempts to explain why the statute was enacted and what the statute means. Unfortunately, the guidance of the legislative history itself  is contradictory.

As mentioned above, the legislative history of the 2005 amendments provides that the use of the term "forward" is not intended to be limited to transactions that fall within the definition of "forward

---

[7]It is unlikely that the transfers before the court qualify for the protections of §§ 546(e) and 548(d)(2)(B), a point apparently conceded by Smithfield both because it is not proceeding under those subsections, and because it acknowledged at the hearing that the provision of the contract  which characterizes the parties as "forward contract merchants" for purposes of the Bankruptcy Code is not relevant to this adversary proceeding.

contracts." H.R. Rep. No. 109-31, Pt.1, at 129.  At the same time, it provides that "[a]s amended, the definition of 'swap agreement' will update the statutory definition and achieve *contractual netting* across economically similar transactions."  H.R. Rep. No. 109-31, Pt.1, at 128 (emphasis added).

> The definition of "swap agreement" originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured.  To that end, the phrase "or any other similar agreement" was included in the definition. . . .  To clarify this, subsection (a)(1) expands the definition of "swap agreement" to include "any agreement or transaction that is *similar to any other agreement* or transaction referred to in [Section 101(53B) of the Bankruptcy Code] *and that is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap markets*" and [that] is a forward, swap, future, or option on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or measures of economic or financial risk or value.
>
> The definition of "swap agreement" in this subsection should not be interpreted to permit parties to document non-swaps as swap transactions.  *Traditional commercial arrangements, such as supply agreements . . . cannot be treated as "swaps" under the FDIA, the FCUA, or the Bankruptcy Code because the parties purport to document or label the transactions as "swap agreements."*

H.R. Rep. No. 109-31, pt.1, at 128-29 (emphasis added).

The legislative history shows that Congress was attempting to be forward-thinking and to draft language that could encompass the expansion of the swap market without requiring repeated amendment. Congress wished to include any and all financial instruments traded in the swap markets, now existing or that may be created in the future, within its definition, which it did through the "any other similar agreement" language.  The definition is intentionally broad in anticipation of expected changes in the use and nature of swap instruments.  Congress also clearly stated, however, that it did not intend for *supply* agreements to be swept into the realm of *swap* agreements.  The restrictive reference to recurrent trade, *taking place*

*in the swap markets*, means that Congress was focused on financial instruments that are themselves regularly the subject of trading, and did not contemplate application of this statute to a contract of the kind at issue here, which is simply an agreement by a single end-user to purchase a commodity.

In construing the statute the court also must, of course, "consider the context in which the statutory words are used because '[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole.'" Ayes v. U.S. Dep't of Veterans Affairs, 473 F.3d 104, 108 (4th Cir. 2006). Here, the context is readily evident: This statute is meant to protect financial markets. Though Smithfield would have the court end the inquiry with the limited language of § 101(53B)(A)(i)(VII), which provides that a swap agreement includes "a commodity index or a commodity swap, option, future or forward agreement," putting the statute in its actual, appropriate context reveals that there is much more to the statutory definition.

It is true enough that § 101(53B)(A)(i) lists numerous agreements that fall within the definition of "swap agreement." Section 101(53B)(A)(ii) provides for additional agreements or transactions that are "similar" to those referred to in § 101(53B)(A)(i) *and* are the subject of recurrent dealings in the swap market *and* are forwards, swaps, futures, or options "on one or more rates, currencies, commodities, equity securities, or other equity instruments . . . " The word "similar," rather than expanding the universe of agreements that come within the umbrella of swap agreements, actually limits the agreements to those that "bear[ ] a family resemblance" to the other agreements and transactions that enjoy the protections of the Bankruptcy Code. Ayes, 473 F.3d at 108. The other agreements described in § 101(53B)(A)(i) are found in financial markets. They do not include contracts between a seller and an end-user for delivery of a product that happens to be a recognized commodity.

24

Congress determined that there are legitimate reasons for creating, in the financial markets, these special exceptions to the overall protections and policies of the Code. The court understands that if contracts traded on a financial market are unraveled, the market itself could become unstable and a domino effect could occur. See H.R. Rep. No. 484, 101st Cong., 2d Sess. (1990). There is nothing to suggest that the contract between Smithfield and the debtor was traded on a financial market, so in this case only the debtor's estate and Smithfield would be affected by a recovery. There is no reason to disturb the established ability of the trustee to avoid the alleged fraudulent transfers at issue in this case.

The consequences of including agreements such as the one before the court within the definition of swap agreement would be far-reaching. Not only are all transfers under swap agreements protected from the reach of a trustee in preference and fraudulent transfer actions, but setoffs by a swap participant of mutual debt, and claims under a swap agreement, are excepted from the automatic stay. See 11 U.S.C. § 362(b)(17). The rights to liquidate, terminate or accelerate a swap agreement cannot be stayed, avoided or limited by the Code or the court, 11 U.S.C. § 560, bankruptcy default clauses are enforceable, 11 U.S.C. § 561(a), and there are special provisions for rejection damages. See 11 U.S.C. § 562. These exceptions to the trustee's avoidance powers were intended to avoid the greater danger of market disruption and instability in the financial markets due to the domino effect likely as a result of some types of transfer avoidance. Congress certainly did not intend by the amendment to create a new, equally disruptive ripple effect within the administration of bankruptcy estates. The court must take into consideration the effect its decision will have on the overall scheme of the Bankruptcy Code. If *this* agreement is a swap agreement, then many of the most important aspects of the Code, including priorities of distributions to creditors and the automatic stay, will be eviscerated in even the smallest case of a farmer

who contracts to sell his hogs at the end of the month for a set price. No public purpose would be served, and the result would be wholly at odds with the established aims and order of bankruptcy proceedings.

The court's conclusion that the contract at issue is not within the definition of a swap agreement also comports with an important guiding principle for all bankruptcy courts, which was recently emphasized by the United States Supreme Court in <u>Howard Delivery</u>, 126 S. Ct. at 2109. The Court stated that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." In that case, the Court concluded that it was "far from clear" that an employer's liability to provide worker's compensation coverage came within the language of § 507(a)(5), which confers priority for contributions to an employee benefit plan arising from services rendered. 126 S. Ct. at 2116. For that reason, and because other factors also weighed against that categorization, the Court determined that "any doubt concerning the appropriate characterization . . . is best resolved in accord with the Bankruptcy Code's equal distribution aim." 126 S. Ct. at 2116. Affording to the trustee the full range of his statutory avoidance powers, on the facts before the court, is in line with both the Code's goal of equal distribution and "the complementary principle that preferential treatment of a class of creditors is in order only when clearly authorized by Congress." 126 S. Ct. at 2109.

Both parties have made solid arguments to support their positions, but it is not clear to the court that the definition of swap agreement is broad enough to cover the contract between National Gas and Smithfield. Resolution of this case, as with <u>Howard Delivery</u>, turns on the "essential character" of the market protection statutes at issue. 126 S. Ct. at 2113. Because the contract is not clearly within the definition of swap agreement, the court will not upset the priority scheme of the Bankruptcy Code by

26

affording the transfers under the contract the protections afforded to swap agreements and swap participants under § 546(g), and under § 548(c) and § 548(d)(2)(D).

Accordingly, Smithfield's motion to dismiss and alternative motion for summary judgment are **DENIED**.  Because the court has not relied on the affidavit of Ms. Gotham in reaching its decision, it is not necessary to address Smithfield's motion to strike.

**SO ORDERED.**

**END OF DOCUMENT**