# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WILSON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **NATIONAL GAS DISTRIBUTORS, LLC,** | ) | **Bankr. Case No. 06-00166-8-ATS** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |
| | | |
| **RICHARD M. HUTSON, II, TRUSTEE FOR** | ) | **Bankr. Adversary Proc.** |
| **NATIONAL GAS DISTRIBUTORS, LLC,** | ) | **No. 06-00267-8-ATS** |
| f/k/a Paul Lawing, Jr., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | ____ Civ. _____(_____) |
| | ) | |
| v. | ) | |
| | ) | |
| **THE SMITHFIELD PACKING COMPANY,** | ) | |
| **INCORPORATED,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**STATEMENT OF AMICUS CURIAE THE INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. IN SUPPORT OF MOTION OF THE SMITHFIELD PACKING COMPANY, INCORPORATED PURSUANT TO 11 U.S.C. § 158(a)(iii) AND FEDERAL BANKRUPTCY RULES 8001(b) AND 8003 FOR LEAVE TO APPEAL BANKRUPTCY COURT ORDERS OF MAY 24, 2007 AND JUNE 20, 2007; AND REQUEST PURSUANT TO 11 U.S.C. § 158(d)(2) AND FEDERAL BANKRUPTCY RULE 8001(f) FOR CERTIFICATION FOR**
<u>**DIRECT APPEAL TO COURT OF APPEALS**</u>

Now comes *Amicus Curiae* the International Swaps and Derivatives Association, Inc.

("ISDA"), by and through counsel, and files this Statement in support of Defendant The Smithfield

Packing Company, Incorporated's ("Smithfield") Motion Pursuant to 11 U.S.C. § 158(a)(iii) and

Federal Bankruptcy Rules 8001(b) and 8003 for Leave to Appeal Bankruptcy Court's Order of May 24,

2007 Denying Motion to Dismiss and Alternative Motion for Summary Judgment; and Request

Pursuant to 11 U.S.C. § 158(d)(2) and Federal Bankruptcy Rule 8001(f) for Certification for Direct

Appeal to Court of Appeals (the "Motion").  In support of the Motion, ISDA respectfully states as

follows:

1.      ISDA submitted an Amicus Brief (attached hereto as Exhibit A) (the "ISDA Brief") in support of Smithfield's motion to dismiss the complaint of Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, f/k/a/ Paul Lawing, Jr., LLC (the "Plaintiff") in the adversary proceeding Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, ("National Gas Distributors") f/k/a/ Paul Lawing, Jr., LLC, vs. The Smithfield Packing Company, Incorporated (the "Complaint") (Adversary Proc. No. 06-00267-8-ATS) because of the importance of the issues presented by this proceeding to the financial markets.

2.      ISDA, which represents participants in the privately negotiated derivatives industry, is the largest global financial trade association, by number of member firms. ISDA was chartered in 1985, and today has over 780 member institutions from 54 countries on six continents. These members include most of the world's major institutions that deal in privately negotiated derivatives, as well as many of the businesses, governmental entities and other end users that rely on over-the-counter derivatives to manage efficiently the financial market risks inherent in their core economic activities.

3.      ISDA believes that the Bankruptcy Court's narrowing of the scope of the Bankruptcy Code's "safe harbors" with respect to derivative transactions will have a disruptive and deleterious effect on the financial markets.  The derivatives industry depends on, among other things, a predictable and stable system of bankruptcy laws.  The Bankruptcy Court's ruling as a matter of law that the contract between National Gas Distributors and Smithfield was not a "swap agreement" but rather a "supply agreement" and therefore does not fall within the newly expanded Bankruptcy Code definition of swap agreement is contrary to both the express language of the Bankruptcy Code and Congressional intent.  That the Bankruptcy Court chose this path by analogizing the large-scale, future-priced contract

to "the smallest case of a farmer who contracts to sell his hogs at the end of the month for a fixed price" is particularly confusing.  This confusion is heightened by the absence of fact finding.  The Bankruptcy Court's ruling has drawn a great deal of attention in the industry and needs to be addressed as soon as possible so that a clear precedent on this new and important provision can be established

4.  As discussed in ISDA's Brief, based on the Bankruptcy Code's plain language, Congressional intent and industry understanding, the contract at the center of this case must be included within the sweep of the revised definition of "swap agreement" in the safe harbor provisions of the Bankruptcy Code.  *See* ISDA Brief at 13.  The plain language of the statute is unequivocal: "The term 'swap agreement' (A) means . . . (VII) a commodity index or a commodity swap, option, future or forward agreement[.]"  11 U.S.C. § 101(53B).  The importance of the inclusion of "commodity forwards" is underscored by the 2006 amendment that added "spot commodity agreement" to the definition of swap agreement.  This makes it abundantly clear that physically-settled transactions with end-users are "swaps."  11 U.S.C. § 101(53B)(A)(ii)(II).  Meanwhile, all parties to this case, including the Bankruptcy Court, acknowledge that the contract at issue is a "forward contract" within Code section 101(25): "[T]he court determined that for purposes of the motion, the contract . . . would be considered a forward contract."  Order Denying Defendant's Motion to Amend at 4.  Likewise, the definition of "swap agreement," consistent with Congressional intent, must be read to be at least broad enough to cover commodities forward agreements like the Smithfield gas contract.  *See* ISDA Brief at 13.

5.  The Bankruptcy Court's ruling that "as a matter of law" the Smithfield gas contract is not a swap appears grounded in a pre-BAPCPA view of swaps, which is contrary to the expansive intent of Congress on this point.  Significantly, as set forth in ISDA's Brief, Congress, discussing a

catch-all provision it added to the definition of "swap agreement," expressly stated that it intended to have a very broad definition of swaps so that further amendments in this area would not be necessary: "[t]he definition of 'swap agreement' originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured."  H.R. Rep. No. 109-31, Pt. 1, at 128.  The Bankruptcy Court's apparent differentiation between the term "contract" and "agreement" is also not consistent with this clear intent: "The use of the term 'forward' [agreement] in the definition of 'swap agreement' is not intended to refer only to transactions that fall within the definition of 'forward contract.'  Instead, a 'forward' transaction could be a 'swap agreement' even if not a 'forward contract.'"  H.R. Rep. No. 109-31, Pt. 1, at 129.  The Bankruptcy Court's suggestion that a contract that is clearly a forward agreement within clause (i) of the definitions of swap agreement must be reassessed under the "similar" agreement language of clause (ii) of the definitions is not consistent with the Bankruptcy Code and Congressional intent.  *See* ISDA Brief at 10.

6.     ISDA is not aware of any other decisions interpreting this new provision of the Bankruptcy Code.  Given that this is a new and important issue, ISDA respectfully submits that an immediate review of the Bankruptcy Court's decision is warranted.  ISDA further agrees with Smithfield that a review of this decision by the Fourth Circuit Court of Appeal is appropriate and urges the Court to consider certification of this appeal for direct appeal to the Fourth Circuit pursuant to 28 U.S.C. § 158(d)(2).

7.     As noted above, the ISDA Brief filed with the Bankruptcy Court is attached hereto for the Court's reference.  ISDA would welcome the opportunity to submit further briefing so that the Court may have the view of the industry on this important issue.

Dated: June 29, 2007                 ALLEN & OVERY LLP

By: /s/ Hugh McDonald
        Joshua Cohn
        Hugh McDonald
        Matthew North
Attorneys for Amicus Curiae, International
Swaps and Derivatives Association, Inc.
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 610-6300


Dated:  June 29, 2007               POYNER & SPRUILL LLP

By: /s/ David M. Warren
        David M. Warren
        NC State Bar No. 12581
        LR 83.1 Counsel
Attorneys for Amicus Curiae, International
Swaps and Derivatives Association, Inc.
Post Office Box 353
Rocky Mount, NC  27802-0353
Telephone: (252) 972-7112
Facsimile:  (252) 972-7045

**<u>EXHIBIT A</u>**

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### WILSON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| NATIONAL GAS DISTRIBUTORS, LLC, | ) | Case No. 06-00166-8-ATS |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| RICHARD M. HUTSON, II, TRUSTEE FOR | ) | Adversary Proc. |
| NATIONAL GAS DISTRIBUTORS, LLC, | ) | No. 06-00267-8-ATS |
| f/k/a Paul Lawing, Jr., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE SMITHFIELD PACKING COMPANY, | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## BRIEF AND MEMORANDUM
### OF LAW OF THE INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, AS *AMICUS CURIAE*, IN SUPPORT OF DEFENDANT'S MOTION (A) TO DISMISS TRUSTEE'S COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 7012, OR, IN THE ALTERNATIVE, (B) FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 7056

Joshua D. Cohn
Hugh McDonald
Matthew D. North
ALLEN & OVERY LLP
  1221 Avenue of the Americas
  New York, NY  10020
  (212) 610-6300
Counsel for The International Swaps and
Derivatives Association, Inc.

POYNER & SPRUILL LLP

By: /s/ David M. Warren
      David M. Warren
      NC State Bar No. 12581
      LR 83.1 Counsel
Attorneys for Amicus Curiae, International
Swaps and Derivatives Association, Inc.
Post Office Box 353
Rocky Mount, NC  27802-0353
Telephone: (252) 972-7112
Facsimile:  (252) 972-7045

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................10

STATEMENT OF INTEREST ...........................................................................................12

PRELIMINARY STATEMENT ..........................................................................................13

ARGUMENT .....................................................................................................................13

    Congress intended stability and predictability of the treatment of certain transactions in bankruptcy situations in order to protect critical markets ...................13

    What Constitutes a Forward? ......................................................................................22

    A Forward Agreement May Have Some Elements of a Supply Agreement.........................24

    The Contract At Issue In This Case Should Be Within The Swap Agreement Safe Harbor..........................................................................................................................25

    Conclusion...................................................................................................................26

## TABLE OF AUTHORITIES

### CASES

*BCP Liquidating LLC v. Bridgeline Gas Marketing, LLC (In re Borden Chemicals and Plastics Operating Limited Partnership, et al.)*, 336 B.R. 214 (Bankr. D. Del. 2006) ...................... 11, 12, 18, 20

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) .................................................................... 15

*In re Paschal*, 337 B.R. 274 (Bankr. E.D.N.C. 2006) ........................................................................... 16

*Williams v. Morgan Stanley Capital Group (In re Olympic Natural Gas Co.)*, 294 F.3d 737 (5th Cir. 2002) ........................................................................................................................................... 12, 20

### STATUTES

11 U.S.C. § 101(53B) ....................................................................................................................... *passim*

11 U.S.C. § 546(e) .................................................................................................................................. 15

11 U.S.C. § 546(g) ............................................................................................................................... 9, 15

11 U.S.C. § 561 ...................................................................................................................................... 10

N.Y.U.C.C. § 1-201 (2001) ................................................................................................................... 18

### LEGISLATIVE MATERIALS

H.R. Rep. No. 109-31 (2005), *available at* 2005 WL 832198 ................................................. 7, 13, 14, 16

H.R. Rep. No. 101-484 (1990), *available at* 1990 WL 92539 .......................................................... 8, 10

H.R. Rep. No. 109-648 (2006), *available at* http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_cong_reports&docid=f:hr648p1.109.pdf ..................................................................................................................................................... 15, 19

*Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcommittee on Economic and Commercial Law of the House Comm. on the Judiciary*, 101st Cong. 1 (1990) ........................................................................................................... 9

### MISCELLANEOUS

Ann Davis, *Wall Street Is Warming Up To Pipelines*, Wall St. J., May 31, 2006 ................................. 12

Bank for International Settlement, Monetary and Economic Department, *OTC derivatives market activity in the first half of 2006*, *available at* http://www.bis.org/publ/otc_hy0611.pdf .................... 7, 17

Benjamin N. Cardozo, *Growth of the Law* (1924) ................................................................................. 8

Black's Law Dictionary (7th Ed.) ................................................................................................ 17

Board of Governors of the Federal Reserve, *Instructions for Semiannual Report of Derivatives Activity*, *available at* http://www.federalreserve.gov/boarddocs/reportforms/forms/FR_243620061208_i.pdf... 11

BusinessDictionary.com, *available at*, http://www.businessdictionary.com/definition/commodity-swap.html ................................................................................................................................. 11

Glossary, *available at* http://www.blackstoneenergy.com/cglossary.html ............................................ 11

Glossary, *available at* http://www.financewise.com/public/edit/energy/glossary/c.html...................... 11

John Wood, *Weather Derivatives*, in Jonathan Denton, ed., *Practical Derivatives: A Transactional Approach* (Globe Business Publishing Ltd., London, 2006) ................................................................. 17

Michael H. Krimminger, *Adjusting the Rules: What Bankruptcy Reform Will Mean for Financial Markets Contracts*, *available at* http://www.fdic.gov/bank/analytical/fyi/2005/101105fyi.html........... 17

Peter H. Huang, *A Normative Analysis of New Financially Engineered Derivatives*, 73 S. Cal. L. Rev. 471 (2000), available at http://www-rcf.usc.edu/~usclrev/pdf/073301.pdf .............................................. 7

Remarks by Chairman Alan Greenspan at the 2003 Conference on Bank Structure and Competition, Chicago, Illinois (via satellite), May 8, 2003, *available at* http://www.federalreserve.gov/boarddocs/speeches/2003/20030508/default.htm.................................... 7

*Statement of Douglas H. Jones, Senior Deputy General Counsel, Federal Deposit Insurance Corporation, on Bankruptcy Reform Legislation, Committee on Banking, United States Senate, March 25, 1999*, *available at* http://www.fdic.gov/news/news/speeches/archives/1999/sp25mar99b.html........ 8

**STATEMENT OF INTEREST**

Amicus Curiae the International Swaps and Derivatives Association, Inc. ("ISDA") submits this memorandum in support of the motion to dismiss the complaint of Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, f/k/a/ Paul Lawing, Jr., LLC (the "Plaintiff") in the adversary proceeding Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, ("National Gas Distributors") f/k/a/ Paul Lawing, Jr., LLC, vs. The Smithfield Packing Company, Incorporated (the "Complaint") (Adversary Proc. No. 06-00267-8-ATS).  A ruling by this Court that narrowed the scope of the Bankruptcy Code's "safe harbors" with respect to derivative transactions (including, among others, swaps and forwards) could disrupt the markets in which many of ISDA's members are active participants and upset legislation Congress has instituted to protect the integrity and efficiency of U.S. markets.

ISDA, which represents participants in the privately negotiated derivatives industry, is the largest global financial trade association, by number of member firms. ISDA was chartered in 1985, and today has over 780 member institutions from 54 countries on six continents. These members include most of the world's major institutions that deal in privately negotiated derivatives, as well as many of the businesses, governmental entities and other end users that rely on over-the-counter derivatives to manage efficiently the financial market risks inherent in their core economic activities.

Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management industry. Among its most notable accomplishments are: developing the ISDA Master Agreement; publishing a wide range of related documentation materials and instruments covering a variety of transaction types; producing legal opinions on the enforceability of netting and collateral arrangements (available only to ISDA members); securing recognition of the risk-reducing effects of netting in determining capital requirements; promoting

sound risk management practices, and advancing the understanding and treatment of derivatives and risk management from public policy and regulatory capital perspectives.

**PRELIMINARY STATEMENT**

This case presents issues that are important to the financial markets. The Plaintiff is asserting that the contract at issue does not qualify for treatment under the Bankruptcy Code safe harbors because the contract cannot be viewed as a swap. The Plaintiff asserts that the contract is not a forward agreement and even if it is a forward, it is a "forward contract" and not a "forward agreement", as contemplated by the definition of "swap" in section 101(53B)(A)(i)(VII) of the Bankruptcy Code. The Plaintiff points to certain aspects of the contract, notably the physical settlement element, to argue that it is not the type of agreement that is commonly viewed as a swap.

As set forth below, the Bankruptcy Code and Congressional intent in this area has been very clear – the financial markets must be protected from the uncertainty that ensues after the insolvency of a counterparty. The recent amendments to the Bankruptcy Code provided not only greater protections to counterparties, including expanded lists of specifically-protected transactions, but also additional flexibility to the underlying definitions with the stated intent that such definitions be accorded a broad and flexible interpretation so that future amendments would not be necessary to address changes in the market. A determination as to the nature of the underlying contract in this matter should be consistent with this Congressional intent and should establish that (1) a commodity forward agreement, be it physically- or cash-settled, is a "swap agreement" within the meaning of the Bankruptcy Code and (2) the contract in question is in fact eligible for safe harbor protection.

**ARGUMENT**

**I.    Congress intended stability and predictability of the treatment of certain transactions in bankruptcy situations in order to protect critical markets.**

The derivatives markets involve a significant number of participants and an enormous amount of capital.  These markets continue to grow rapidly.  As of June 2006, the notional amount of all types of over-the-counter derivative contracts stood at $370 trillion, which represented 24% growth over the amount reported six months earlier.  Of that $370 trillion, commodity contracts which are forwards and swaps had a notional amount of $2.2 trillion.  Bank for International Settlement, Monetary and Economic Department, *OTC derivatives market activity in the first half of 2006* (Basel 2006), *available at* http://www.bis.org/publ/otc_hy0611.pdf.  Alan Greenspan has said, with respect to the derivatives markets, that

> The use of a growing array of derivatives and the related application of more-sophisticated methods for measuring and managing risk are key factors underpinning the enhanced resilience of our largest financial intermediaries. . . . not only have individual financial institutions become less vulnerable to shocks from underlying risk factors, but also the financial system as a whole has become more resilient.

Remarks by Chairman Alan Greenspan at the 2003 Conference on Bank Structure and Competition, Chicago, Illinois (via satellite), May 8, 2003, available at http://www.federalreserve.gov/boarddocs/speeches/2003/20030508/default.htm.

The importance of these financial contracts to the smooth functioning of the overall economy should not, then, be underestimated.

Justice Cardozo's recognition of "the overmastering need of certainty in the transactions of commercial life" is as apt today with respect to the swap, forward and other derivative markets[1] as it was eighty years ago.  Benjamin N. Cardozo, *Growth of the Law* 110 (1924).  Congress has recognized that vital markets require stable, predictable treatment of transactions in the event of the

---

[1] *See, e.g.*, H.R. Rep. No. 109-31, Pt. 1, at 3 (2005).  Although we refer to swap, derivatives and forward markets for purposes of clarity and completeness, we note that we could simply refer instead to the "derivatives markets."  Derivatives comprise a variety of transaction types generally constructed of elements of forwards and options.  Swaps may be characterized as chains of forwards.  *See, e.g.*, Peter H. Huang, *A Normative Analysis of New Financially Engineered Derivatives*, 73 S. Cal. L. Rev. 471 at 483 (2000), available at http://www-rcf.usc.edu/~usclrev/pdf/073301.pdf.  The evolution in ISDA's own name reflects the multifaceted characteristics of the derivatives markets and the understanding in the financial markets (and in Congress) that markets once referred to generically as "swaps markets" actually encompass a rich array of transactions.  Thus, ISDA, once the "International Swap Dealers Association, Inc.," became the

bankruptcy of a counterparty in order to avoid risks to the markets themselves. *See, e.g.,* H.R. Rep. No. 101-484, at 2 (1990) (relating to amendments creating the first version of the swap agreement safe harbor). Preference and fraudulent conveyance actions that would unwind transfers made in connection with relevant transactions jeopardize the efficient working of our financial markets. Perceived inadequacies in legal protection against such unwinds will place the competitive position of the United States in global markets at risk.[2]

In a statement before the Senate Committee on Banking (with respect to a 1999 iteration of the bankruptcy reform bill that was ultimately passed in 2005), Douglas H. Jones, Senior Deputy General Counsel to the Federal Deposit Insurance Corporation, underscored the desire to minimize systemic risk and the need for adequate legal protection to keep the United States competitive in world markets:

> The series of "netting" amendments to the Bankruptcy Code and the FDI Act over the past two decades were designed to further the policy goal of minimizing the systemic risks potentially arising from certain interrelated financial activities and markets. Systemic risk has been defined as the risk that a disruption—at a firm, in a market segment, to a settlement system, etc.—can cause widespread difficulties at other firms, in other market segments or in the financial system as a whole. Netting helps reduce this risk by reducing the number and size of payments necessary to complete transactions. As a result, it allows greater liquidity in the system by reducing the amounts necessary for each party to settle its transactions. If participants in certain financial activities are unable to enforce their rights to terminate financial contracts with an insolvent entity in a timely manner, and to offset or net payment and other transfer obligations and entitlements arising under such contracts, the resulting uncertainty and potential lack of liquidity could increase the risk of an inter-market disruption. . . . While these laws provide significant assurances that the risk reduction benefits of close-out netting are available under U.S. law, the provisions of Title X are an important step toward harmonizing these statutory provisions which were enacted over more than a decade. In addition, Title X permits our statutes to remain abreast of innovations that have occurred in our financial markets since 1989. As a result, enactment of Title X is a crucial step to maintaining the U.S. as the leader in financial innovation and risk management.

---

International Swaps and Derivatives Association on August 9, 1993. This change reflected both the breadth of instrument previously represented by the term "swaps" alone and the expansion of ISDA membership beyond the dealer community.

[2] *See, e.g., Statement of Douglas H. Jones, Senior Deputy General Counsel, Federal Deposit Insurance Corporation, on Bankruptcy Reform Legislation, Committee on Banking, United States Senate, March 25, 1999, available at* http://www.fdic.gov/news/news/speeches/archives/1999/sp25mar99b.html.

*Statement of Douglas H. Jones, Senior Deputy General Counsel, Federal Deposit Insurance Corporation, on Bankruptcy Reform Legislation, Committee on Banking, United States Senate, March 25, 1999, available at* http://www.fdic.gov/news/news/speeches/archives/1999/sp25mar99b.html

Congress has taken steps to provide appropriate market stability by the creation over the past twenty-five years of a number of transaction-specific "safe harbors" within the bankruptcy laws. Under the safe harbors, among other things, Congress has exempted payments and transfers made under certain contracts from preference and fraudulent conveyance actions and thus sought to safeguard the markets by preventing bankruptcy filings from interfering with the certainty of relevant contracts.

> [The 1978 Bankruptcy Reform Act] recognized that certain complex, time sensitive obligations warranted a degree of finality at the outset of a bankruptcy in order to prevent uncertainty in a marketplace where trading is continuous and often transitional in character.  In 1982 and 1984, new amendments were added that exempted other types of arrangements that appeared to fall into the same category of financial agreements deserving expeditious treatment following a bankruptcy filing.

*Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcomm. on Economic and Commercial Law of the House Comm. on the Judiciary*, 101st Cong. 1 (1990).

In its enactment of the 1990 Amendments to the Bankruptcy Code—one of which was the introduction of section 546(g), the specific provision in issue in the case at hand—Congress left no room for doubt that the purpose of the enactment was to provide certainty to the markets.  The purpose of the bill, according to an accompanying House report, was "to ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code."  H.R. Rep. No. 101-484, at 1.

In 1990 and before, it was common to view markets as if each were based on a narrow type of transaction. As we explain below, however, the diversity of relevant transactions and interconnectedness of markets has since become quite apparent, to the extent that Congress expressly provided for master netting agreements allowing netting across multiple previously separate safe harbors (*see* 11 U.S.C. § 561) and, as described below, expressly created clear overlaps between separate categories of safe-harbored transactions.

### A. The safe harbor provisions protect both financially- and physically-settled transactions.

Congress has not restricted the application of safe harbor provisions to financially-settled transactions. To the contrary, Congress has recognized that the protected markets may include physically-settled transactions. In the intervening years since 1990, Congress has twice broadened the safe-harbors provided more than a decade earlier. Most pertinently, Congress from the outset has expanded the common or vernacular definition of "swap agreement" both to take account of new kinds of transactions commonly known as swaps and to take account of transactions not commonly known as swaps but used in the markets in conjunction with swaps. Thus, for example, in 1990, Congress included within the definition of "swap agreement" "forward rate agreements." In 2005, Congress added a broad list of forwards to the now-sweeping definition of "swap agreement"—that is to say interest rate forwards, foreign exchange/precious metals forwards, currency forwards, equity forwards, debt index forwards, total return or credit forwards and commodities forwards are each an enumerated transaction type. 11 U.S.C. § 101 (53B).

While swaps are very often financially-settled, swaps also can be physically-settled. Whereas in a financial settlement payment streams are exchanged, in a physical settlement the "principal" — oil, say, in a commodity swap with oil as the underlying commodity — is actually

delivered to one of the parties.[3] The broad application of the safe harbor to physically-settled transactions is clear from the Bankruptcy Code and Congressional intent. Reliance on sources other than the Bankruptcy Code, such as accounting standards, to limit this broad application, as Plaintiff suggests, is misplaced and inconsistent with this intent. Indeed, the court in *BCP Liquidating LLC v. Bridgeline Gas Marketing, LLC* (*In re Borden Chemicals and Plastics Operating Limited Partnership, et al.*) ("*In re Borden Chemicals*"), 336 B.R. 214 (Bankr. D.Del. 2006) considered and rejected an argument that the safe harbor provisions should be viewed through the lens of the standards issued by the Financial Accounting Standards Board ("FASB"): "The remainder of the affidavit focuses on the fact that an agreement for the purchase and sale of a commodity . . . is exempted from the definition of a forward contract by [FASB]. While this may create an issue as to how the Agreement is treated under FASB standards, the Court thinks this immaterial as to how the Agreement is treated under the Code." *In re Borden Chemicals,* 336 B.R. at 219.

Equally illustrative of Congressional intent that appropriate physically-settled transactions be included in the scope of the swap agreement safe harbor, Congress in 1990 expanded the common definition of "swap" to refer to "spot foreign exchange transactions" in the Code definition. In 2005, the Code definition expanded further to include foreign exchange or precious metals spot transactions. In 2006, the definition grew even more to encompass commodity spot transactions.[4] "Spot" transactions are always physically-settled, immediate transactions.[5]

---

[3] *See* definitions of "commodity swap" at http://www.blackstoneenergy.com/cglossary.html, http://www.financewise.com/public/edit/energy/glossary/c.html, http://www.businessdictionary.com/definition/commodity-swap.html. Credit default swaps are also sometimes settled by physical delivery of the deliverable obligations of the reference entity. *See also* the Board of Governors of the Federal Reserve's *Instructions for Semiannual Report of Derivatives Activity*, available at http://www.federalreserve.gov/boarddocs/reportforms/forms/FR_243620061208_i.pdf, at 12.

[4] The 1990 provisions and the 2005 amendments are definitely applicable to this case as the effective date of the 2005 amendments was October 17, 2005. Although the 2006 amendments were not applicable until December of 2006, those amendments were in general intended merely to make "technical changes" to the 2005 amendments to "update the language to reflect current market and regulatory practices, and help reduce systemic risk in the financial markets by clarifying the treatment of certain financial products in cases of bankruptcy or insolvency." Such revisions were necessary because the process to pass an overall bankruptcy bill did not permit the time or attention needed to update "financial contract" amendments that had been pending in earlier years. Thus, we refer to the 2006 amendments as indicative of Congressional intent generally, both with respect to the 2005 and 2006 provisions.

[5] To be clear, however, that its goal of market protection was unchanged, in the commentary to the 2006 amendments, Congress stated that "the reference in the definition of 'swap agreement' to spot transactions in commodities is not intended to encompass ordinary sales of goods contracts, but rather financial market transactions in commodities." H.R. Rep. No. 109-648, Pt. 1, at 7 (2006). While Congress intended safe-harbor protections, in the context of spot transactions, only to extend to "financial market transactions"—and in the context of the definition of "swap agreement" a distinction is drawn between "[t]raditional commercial arrangements, such as supply agreements" and financial market transactions—it appears that the distinction is neither used nor useful in the context of forwards. In *Williams v. Morgan Stanley Capital Group* (*In re Olympic Natural Gas Co.*), 294 F.3d 737 (5th Cir. 2002) and *In re Borden Chemicals* the U.S. Court of

That the swap agreement safe harbor is open to physically-settled transactions is of increasing importance as the connection between cash-settled markets and physically-settled markets becomes ever closer. This is especially true in the case of transactions in energy commodities such as natural gas. Many major financial market participants are now active in both cash- and physically-settled energy sub-markets see, *e.g.*, Ann Davis, *Wall Street Is Warming Up To Pipelines*, Wall St. J., May 31, 2006, as are major energy users. Any bankruptcy engendered maloccurrence in either sub-market can pass rapidly to the other through the books of entities active in both. Entities involved in both sub-markets that are subject to regulatory capital and accounting regimes that provide favorable treatment to safe harbored transactions are dependent on the availability of the safe harbors to their mixed cash and physical portfolios in maintaining their businesses' profitability.

### B.    Congress Has Specifically Enumerated "Commodity Forward Agreements" as Within the Definition of "Swap Agreement."

The definition of "swap agreement" includes multiple subdivisions. The first subdivision, (A)(i), is an expansion of the list of specifically included transactions that comprised the bulk of the 1990 version of the provision. The second subdivision, (A)(ii), is intended to clarify the "any other similar agreement" language in the 1990 definition. *See* H.R. Rep. No. 109-31, Pt. 1 at 128. If a transaction is included within (A)(i), it is <u>not subject</u> to the (A)(ii) criteria intended to dispel the

---

Appeals for the Fifth Circuit and the U.S. Bankruptcy Court for the District of Delaware, respectively, each rejected an argument that Congress intended to distinguish between "financial" forward contracts and "ordinary purchase and sale" forward contracts, "when," as the Fifth Circuit says in *In re Olympic Natural Gas*, "the statutory language makes no such distinction." 294 F. 3d at 742. The Bankruptcy Court for the District of Delaware in *In re Borden Chemicals* expands on this: "[The Debtor] states that 'the House Report goes on to explain that while the avoidance exemptions apply to genuine forward contracts regarding commodities that are not currently listed in the Commodity Exchange Act, the exemptions do not apply to ordinary supply-of-goods contracts, which are not essentially financial in character.' [citations omitted] . . . [I]t is clear that Congress was concerned about protecting only contracts for the future delivery of goods that are the subject of trading in the forward contract market. Therefore, as noted by the Fifth Circuit, there is no basis from which to distinguish amongst forward contracts." 336 B.R. at 220. As discussed *infra*, bulk gas contracts should not be viewed as simply supply arrangements or ordinary sales of goods.

vagueness of the words "any other similar agreement."  *See id*.  This distinction between subdivisions is made quite clear in the statute by use of the word "or."[6]

Thus, for purposes of the present analysis, the pertinent part of the definition of "swap agreement" reads:

> The term "swap agreement"
>
> (A) means—
>
> (i) any agreement, including the terms and conditions incorporated by reference in such agreement, which is
>
> . . .
>
> (VII) a commodity index or a commodity swap, option, future or forward agreement[.]

11 U.S.C. § 101(53B).

The use of the term "forward agreement" might at first glance seem to introduce a bit of confusion given the existence—in related provisions of the Code—of the defined term "forward contract," but the legislative history on the topic leaves little room for doubt that Congress was not playing word games or splitting semantic hairs, but rather was legislating in a manner consistent with its overall breadth-and-flexibility approach:  "The use of the term 'forward' in the definition of 'swap agreement' is not intended to refer only to transactions that fall within the definition of 'forward contract.'  Instead, a 'forward' transaction could be a 'swap agreement' even if not a 'forward contract.'"  H.R. Rep. No. 109-31, Pt. 1, at 129.  Congress deliberately created overlaps in other safe harbored categories as well.  *See* n.7 below.

Although the catch-all "or any other similar agreement" language of the definition of "swap agreement" is not directly applicable to the case at hand, it had an expansive evolution

---

[6] ISDA notes that the Plaintiff has filed with its Memorandum in Opposition to Defendant's Motions to Dismiss and for Summary Judgment an affidavit of Claire P. Gotham.  Given that the affidavit has been provided in connection with this confused reading of the Bankruptcy Code (one which deliberately overlooks the statute's explicit inclusion of commodity forwards within the definition of "swap agreement"), we do not think it is appropriate for the Court to give the affidavit any weight.

demonstrative of Congressional intent.  In discussing changes to the catch-all "or any other similar agreement" portion of the definition of "swap agreement" in section 101(53B)(A)(ii), the House report to the 2005 amendments observes that in fact "[t]he definition of 'swap agreement' originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured."  H.R. Rep. No. 109-31, Pt. 1, at 128.  In the 2005 amendments themselves, Congress made it clear that it was deliberately seeking to broaden the scope of the Bankruptcy Code beyond present industry definitions—the catch-all was expanded to include "any agreement or transaction that is similar to any other agreement or transaction referred to in [Section 101(53B) of the Bankruptcy Code] and that is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap markets . . . ."  11 U.S.C. § 101(53B).

Finally, and most importantly, in the 2006 amendment to the Bankruptcy Code, the latest iteration of the "catchall" at the end of the definition of "swap agreement" in section 101(53B), the phrase "or other derivatives markets" has been added such that the catch-all language now reads "any agreement or transaction that is similar to any other agreement or transaction referred to in [section 101(53B) of the Bankruptcy Code] and that is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivative markets . . . ."  11 U.S.C. § 101(53B).  The House report on the 2006 amendments explains the addition of "or other derivatives markets": "The proposed amendments would change the reference to 'swap markets' to 'swap or other derivatives markets' in order to avoid any suggestion that new developments are limited to transactions that are technically swaps as opposed to other types of derivatives, such as options."  H.R. 109-648, Pt. 1, at 7.  While the operative language for purposes of the present discussion in fact is within one of the specifically "enumerated" portions of the definition of "swap agreement," and does not need to rely on the catch-all language, the addition of "or other derivatives markets" and the accompanying explanation serve to underscore that Congress has sought and

continues to seek to define "swap agreement" as broadly as possible, such that an entire market and industry benefit from the section 546(g) "safe harbor," not just a narrowly-defined set of transactions.  This sort of expansiveness indicates Congressional intent to extend "safe harbor" protection as far as possible, even if the market usage of a given term might be more narrow than the meaning given to that term in the Bankruptcy Code.

Having established that forwards fall within the definition of  "swap agreements" for Bankruptcy Code purposes one might ask whether this renders one of section 546(e) or (g) redundant or superfluous with respect to forwards.  "Forward contracts" receive a certain set of protections, along with securities contracts and commodity contracts, pursuant to section 546(e), while "forward agreements" get broader 'safe harbor' privileges as they are included in "swap agreement" and thus are covered by section 546(g).  Courts have generally held that redundancies across laws, so long as they do not result in outright conflict, do not result in ineffectiveness of either of the laws in issue.  In *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992), the Supreme Court held that "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no "positive repugnancy" between two laws . . . a court must give effect to both." Specifically regarding the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), in *In re Paschal*, 337 B.R. 274 (Bankr. E.D.N.C. 2006), the Court noted, en route to holding that an "expansive" reference to "all creditors" in one section did not render other sections redundant or superfluous, that "many provisions added to the Code by BAPCPA do not always dovetail very neatly."[7]

## II.   What Constitutes a Forward?

---

[7] By way of underscoring that Congress was aware that it was essentially double-protecting in some instances and intended to do so, it is worth looking at the House report on the subject of changes to the  safe harbor provisions specifically applicable only to "repurchase agreements," which underwent changes much like the ones made to the swap agreement provisions: "This amendment is not intended to affect the status of repos involving securities or commodities as securities contracts, commodity contracts, or forward contracts, and their consequent eligibility for similar treatment under other provisions of the Bankruptcy Code.  In particular, an agreement for the sale and repurchase of a security would continue to be a securities contract as defined in the Bankruptcy Code and thus also would be subject to the Bankruptcy Code provisions pertaining to securities contracts, even if not a 'repurchase agreement' as defined in the Bankruptcy Code.  Similarly, an agreement for the sale and repurchase of a commodity, even though not a 'repurchase agreement' as defined in the

Whether or not a "forward agreement" may generally be construed to be a "swap agreement" in common industry parlance is unimportant for Bankruptcy Code purposes in light of the express definition of "swap agreement" and the overriding Congressional intent behind the safe harbor provisions of the Bankruptcy Code.  Indeed, as noted above, the legislative history of the safe harbor provisions clearly indicates that a "forward agreement" does not have to be a "forward contract" as that term is defined.  However, in order to be entitled to the protections of the safe harbors, an agreement must still be a "forward agreement."

Both forward agreements and forward contracts may be referred to in the vernacular simply as "forwards."  Perhaps the most concise definition of a forward is that supplied in an October 11, 2005 "FYI" from the FDIC, which  defines a forward as a "sales contract between a buyer (holding the long position) and a seller (holding the short position) for an asset with delivery deferred until a future date."  Michael H. Krimminger, *Adjusting the Rules: What Bankruptcy Reform Will Mean for Financial Markets Contracts*, *available at* http://www.fdic.gov/bank/analytical/fyi/2005/101105fyi.html.  *See also* John Wood, *Weather Derivatives*, in Jonathan Denton, ed., *Practical Derivatives: A Transactional Approach* (Globe Business Publishing Ltd., London, 2006) ("[A forward] is a contract between two parties to trade an asset at a specific time in the future and at a specific predetermined price.  These products are traded on the OTC market."); Bank for International Settlement, Monetary and Economic Department, *OTC derivatives market activity in the first half of 2006* (Basel 2006) ("Forward contracts represent agreements for delayed delivery of financial instruments or commodities in which the buyer agrees to purchase and the seller agrees to deliver, at a specified future date, a specified instrument or commodity at a specified price or yield.  Forward contracts are generally not traded on organised exchanges and their contractual terms are not standardised.").

---

Bankruptcy Code, would continue to be a forward contract for purposes of the Bankruptcy Code and would be subject to the Bankruptcy Code provisions pertaining to forward contracts."  H.R. Rep. No. 109-31, Pt. 1, at 128.

As noted above, the terms "forward contract" and "forward agreement" are considered to be the same thing for purposes of common industry parlance.  In fact, the Black's Law Dictionary definition for "forward agreement" is "See FORWARD CONTRACT."  *Black's Law Dictionary* (7th Ed.) (it is worth noting also that the definition of "forward contract" contains the statement "Also termed *forward agreement*.").  If anything, "agreement" is generally viewed as a broader term than "contract," such that the use of the term "forward agreement" in section 546(g) represents the casting of a wider net than just "forward contracts*."  See Black's Law Dictionary* (7th Ed.) ("Contract.  An agreement between two or more persons creating obligations that are enforceable or otherwise recognizable at law."; "Agreement.  A mutual understanding between two or more persons about their relative rights and duties regarding past or future performances . . . " The definition goes on to cite Samuel Williston, *A Treatise on the Law of Contracts*, § 2, at 6 (Walter H.E. Jaeger ed., 3d. ed. 1957): "Agreement is in some respects a broader term than contract, or even than bargain or promise."); N.Y.U.C.C. § 1-201 (2001) ("'Contract' means the total legal obligation which results from the parties' agreement as affected by this Act . . ."; "'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance . . .").

Thus, whether a "forward" is a contract or agreement is immaterial in the determination of whether a particular instrument falls within the definition of swap agreement.  Based upon the common industry definitions set forth above, if an agreement has elements of future delivery and settlement, such agreement is considered a forward and, under the Bankruptcy Code definition, a swap.  If the Court concludes that the agreement at issue in this litigation contains the elements of a forward, it would be consistent with the Bankruptcy Code and Congressional intent for the Court to conclude that such agreement is a swap for Bankruptcy Code purposes.

**III. A Forward Agreement May Have Some Elements of a Supply Agreement.**

It is worth pointing out that forwards simultaneously possess certain elements of ordinary supply agreements but also certain elements of hedging arrangements and more sophisticated "financial market transactions."   *In re Borden Chemicals* speaks eloquently on this topic, referencing relevant pieces of the legislative history of the term:

> On this point, the legislative history demonstrates that Congress intended that forward contracts . . . would possess both physical and financial characteristics.  On the physical components, the Senate Report to the 1990 amendments explains that "[a] forward contract is a contract for the purchase, sale or other transfer of a commodity with a maturity date at least 2 days after the date the contract is entered into."  S. REP. No. 101-285, 1990 WL 259288, at 2 (1990).  On the financial characteristics and as already mentioned, the House Report to the 1990 amendments explains that "the principal purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity."  H.R. REP No. 101-484, at 4 (1990).  Similarly, the Senate Report states that "forward contracts play a central role in the movement of commodities among producers and users, as well as in the hedging of risks associated with these and other transactions."  S. REP. No. 101-285, 1990 WL 259288, at 2 (1990).

336 B.R. at 221.

As discussed on page 12, above, that a contract may have more or less of an intrinsic financial market importance may be in part a question of which commodity underlies the contract.  So, for example, contracts for physical delivery of sofas or shoes may be viewed as relatively detached from related cash-settled markets.  Natural gas, however, is the subject of relatively seamless trading between cash and physical sub-markets and, as a result, a maloccurrence in one can easily impact the other.

## IV. The Contract At Issue In This Case Should Be Within The Swap Agreement Safe Harbor.

Plaintiff seems to concede the requisite element of futurity in the contract in question.  See Plaintiff's Memorandum in Opposition to Defendant's Motions to Dismiss and for Summary Judgment at 14.  Nor is there any dispute as to the nature of the underlying commodity, natural gas.  According to the *Borden* court, such a contract would qualify as a forward contract and, hence, a forward agreement within the Bankruptcy Code definition of "swap agreement."  (Further, although

Plaintiff alleges fraud within National Gas Distributors, Plaintiff makes no such allegation regarding Defendant.  Any taint relating to National Gas Distributors' conduct should not color the outcome of this case for Defendant.)

Even if one were to view the contract as a spot contract, which is not the case here, the characterization as a spot contract would seem to qualify such a contract as a spot commodity contract within the Code definition of swap agreement under the 2006 amendments.  Although the relevant House report (H.R. Rep. 109-648, Pt. 1) distinguishes between financial market transactions in commodities and "ordinary sales of goods", the Fifth Circuit resolved a similar distinction in the forward contract context as referring primarily to the type of commodity underlying the contract.  *See In re Olympic Natural Gas Company*, 258 B.R. at 165.  The key question was whether the commodity was subject to dealing in certain markets.  Natural gas of course is the subject of financial market transactions in commodities, *see, e.g.*, *In re Borden Chemicals* at 218, and, as discussed above, is traded across sub-markets in a way that clearly warrants application of safe harbor treatment.  Although we do not know what National Gas Distributors' sources of future supply and hedge arrangements were at the time, it would seem a stretch to describe its bulk sales of gas to be ordinary supply contracts or sales of goods not subject to safe harbor treatment.

**V. Conclusion.**

There is a long history of expressed intent on the part of Congress to provide broad, flexible protection for financial markets. Physical settlement clearly is no bar to a given transaction being safe-harbored as within the scope of protection for these markets.  Moreover, Congress expressly included "forward agreements" in the definition of "swap agreement."   A forward agreement may appear, in certain respects, similar to a supply agreement (in fact, given the rapid development and complexity of "financial markets" transactions, many transactions bearing different labels actually

have a great deal in common).  Congressional intent to extend "safe harbor" protection to forward agreements (whether or not otherwise "swap agreements" within the meaning of the Bankruptcy Code) is clear, both in the plain language of the statute and in relevant legislative history. ISDA believes that a holding by this Court consistent with Congressional intent is necessary to overcome any chilling confusion that would result from arguments advocated by Plaintiff and to serve the prudential goals Congress intended.


Dated: June 29, 2007                    ALLEN & OVERY LLP

                                        By: /s/ Hugh McDonald
                                               Joshua Cohn
                                               Hugh McDonald
                                               Matthew North
                                        Attorneys for Amicus Curiae, International
                                        Swaps and Derivatives Association, Inc.
                                        1221 Avenue of the Americas
                                        New York, NY 10020
                                        Telephone: (212) 610-6300


Dated:  June 29, 2007                   POYNER & SPRUILL LLP

                                        By: /s/ David M. Warren
                                               David M. Warren
                                               NC State Bar No. 12581
                                               LR 83.1 Counsel
                                        Attorneys for Amicus Curiae, International
                                        Swaps and Derivatives Association, Inc.
                                        Post Office Box 353
                                        Rocky Mount, NC  27802-0353
                                        Telephone: (252) 972-7112
                                        Facsimile:  (252) 972-7045